1
2
3
4
5
6
7
8
9
10

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT J. ANDERSON, | No. 2:20-CV-2514-DMC |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, ECF Nos. 9 and 25, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c); see also ECF No. 26 (minute order referring case to Magistrate Judge). Pending before the Court are the parties' briefs on the merits, ECF Nos. 18 and 21.

The Court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support

a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

For the reasons discussed below, the Commissioner's final decision is affirmed.

## I.  THE DISABILITY EVALUATION PROCESS

To achieve uniformity of decisions, the Commissioner employs a five-step sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

| | |
|---|---|
| Step 1 | Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied; |
| Step 2 | If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 3 | If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted; |

/ / /

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

1

## II.  THE COMMISSIONER'S FINDINGS

2      Plaintiff  filed a Title II application on May 10, 2018, for a period of

3 disability and disability insurance benefits. See CAR 163.[1]  Plaintiff alleged that the period of

4 disability began June 1, 2017. On July 17, 2018, Plaintiff's claim was denied, and again upon

5 reconsideration on January 3, 2019. Id.  Plaintiff then filed a written request for a hearing, which

6 was received on February 20, 2019. On January 23, 2020, a hearing was held and on July 9, 2020,

7 a supplemental telephone hearing took place.

8      Plaintiff was found not to be disabled in a prior decision by an ALJ on May 31,

9 2017. Id.  Review was denied, making this decision administratively binding, pursuant to the

10 doctrine of administrative res judicata.  See 20 CFR § 416.1457(c)(1).  Id.  Plaintiff successfully

11 overcame that presumption by showing a changed circumstance, and a sequential evaluation

12 ensued. Id., at 164.

13      In a July 21, 2020, decision, the ALJ concluded that Plaintiff was not disabled

14 during the relevant time-period based on the following relevant findings:

15
16
    1.   The claimant last met the insured status requirements of the Social
         Security Act on June 30, 2020;

17
18
    2.   The claimant did not engage in substantial gainful activity during
         the period from his alleged onset date of June 1, 2017, through his
         date last insured of June 30, 2020;

19
20
21
    3.   Through the date last insured, the claimant had the following
         severe impairment(s): diabetes mellitus-II; obesity; cornea ectasia;
         keratoconus; allergic conjunctivitis and corneal pannus; giant
         papillitis in the right eye; floppy eyelid syndrome; status post
         blepharoplasty; pseudophakia in the right eye; status post YAG
         laser surgery;

22
23
    4.   Through the date last insured, claimant did not have an impairment
         or combination of impairments that meets or medically equals an
         impairment listed in the regulations;

24
25
26
    5.   Through the date last insured, the claimant had the following
         residual functional capacity: to perform medium work as defined
         in 20 CFR 404.1567(c), except he could occasionally climb ramps
         and stairs, kneel, crouch, and frequently crawl. He could
         occasionally climb ropes, ladders, scaffolds. He should avoid work

27
28

---

[1]      Citations are to the Certified Administrative Record (CAR) lodged on July 1, 2022, ECF No. 17.

requiring depth perception or work with small objects or fine print. He should avoid concentrated exposure to workplace hazards such as working at unprotected heights or near moving machinery. He must avoid concentrated exposure to environmental irritants, such as dust, gases, fumes, and chemicals;

6.    Through the date of last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

7.    Through the date last insured, the claimant was not under a disability, as defined in the Social Security Act.

See id. at 163-173.

After the Appeals Council denied review on October 21, 2020, this appeal followed.

**III. DISCUSSION**

Plaintiff argues in his brief: (1) the ALJ erred at Step 2 in determining Plaintiff's severe impairments; (2) the ALJ erred at Step 3 in concluding that Plaintiff's impairments failed to satisfy the Listings; (3) the ALJ's determination of Plaintiff's residual functional capacity at Step 4 is not supported by substantial evidence; and (4) the ALJ erred at Step 5 in concluding that Plaintiff can perform other work.[2]

As discussed in more detail below, Plaintiff's brief is bereft of analysis of the facts of this case in support of any legal claim of error. While Plaintiff asserts claims arising throughout the sequential evaluation process, his arguments in support of each claim largely consist of lengthy citations to other cases, including citations to the records and doctors specific to those cases. Notably missing is any analysis to the specific evidence in this case.

---

[2]    Plaintiff's brief is styled as a traditional motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and is accompanied by a separate Statement of Undisputed Material Facts (SUMF), ECF No. 18-5, and supporting Exhibits A-D, ECF Nos. 18-2 through 18-4, which are portions of the certified administrative record lodged by Defendant. These submissions are unnecessary. A review of the Commissioner's final decision considers a closed administrative record, and more closely resembles appellate litigation or administrative review than civil litigation including discovery and disputed or undisputed facts. See 42 U.S.C. § 405(g). As the Court has an obligation to review the record as a whole, and because the Court only considers the certified administrative record, Plaintiff's duplicative exhibits and statement of undisputed facts are not considered except as to provide a background of Plaintiff's case.

5

1       Given this backdrop, and consistent with the Court's duty to fully examine the

2  record and provide the parties a fair consideration, the Court finds it necessary to summarize the

3  evidence of record, a time-consuming task required by the manner in which Plaintiff's brief is

4  presented.  Here, Defendant's brief, which cites to the lodged certified administrative record

5  (denoted "AR" in Defendant's brief), is helpful.  The Court adopts Defendant's summary of the

6  record.  See ECF No. 21, pgs. 2-5.

7       As to Plaintiff's hearing testimony, Defendant accurately summarizes Plaintiff's

8  allegations as follows:

9           At the January 2020 hearing, Plaintiff testified that he could not
       work because of his eyesight (AR 38). He said that his eyesight had
10      improved somewhat since he stopped working (AR 38-39). He had a
       driver's license and was able to drive but required a driving test every two
11      years (AR 39-40). Plaintiff required large print for reading and did not ride
       his motorcycle at night (AR 40). He described his motorcycle advocacy
12      work, and said he was the chairman of Bikers' Rights from 2016 to 2019
       and held monthly meetings with local clubs but had since stepped away
13      from a leadership role there and in his local club (AR 46-47).

14      ECF No. 21, pg. 4.

15      Defendant also accurately summarizes the medical record as follows:

16          . . .In November 2016, [Plaintiff] asked optometrist Julene Pena,
       O.D., but Dr. Pena declined to "write he is unemployable due to his vision
17      but can explain his conditions and what bothers these conditions" (AR
       783). Nearly four years later, in June 2020, Dr. Pena wrote a letter stating
18      that Plaintiff had "extreme photophobia" that was "visually debilitating for
       him to function even in normal lighting conditions," that "exposing him to
19      bright lights and toxic chemicals [was not] in his best interest," and that a
       "significant difference" in visual acuity between his right and left eyes
20      meant that he had decreased depth perception (AR 1234).
           Plaintiff also asked mental health nurse Hazel Diane Ayson, RN,
21      BC, for an opinion supporting disability in June 2017, but Nurse Ayson
       wrote, "we do not generally write letters for purposes of legal or disability,
22      esp[ecially] since he hasn't been seen here since 2006" (AR 682). Plaintiff
       again tried to get Nurse Ayson to assist him with his disability claim in
23      August 2018, but she again declined, explaining that he was not in active
       treatment with them, that her practice saw Plaintiff "only a handful of
24      times" in 2005 and 2006 as well as one time in 2017, and he had had
       no treatment since then (AR 855). Plaintiff's limited mental health
25      treatment notes showed that in June 2017, he said he was doing well,
       taking Citalopram, and managing his anxiety with medications and
26      grounding exercises (AR 682). He complained that Social Security
       discriminated against him—"I told the judge that I ride a motorcycle, and
27      I'm white"—but he acknowledged also that he took care of his
       grandchildren, hiked and camped, and was active in a motorcycle club
28      (AR 682). In early 2018, he called Nurse Ayson but told her he did not

                                          6

1    want to say he was better because Social Security would "hold that against
     me," but he did not need treatment (AR 739).

2            Four other medical sources offered assessments of Plaintiff's
     ability to work. In July 2018, Yvonne Post, D.O., a State agency medical

3    consultant, noted Plaintiff's allegations of eye problems and vision
     impairment, but based on her review of the records, she concluded that

4    Plaintiff could perform medium work with visual limitations (AR 134,
     136-37). That same month, State agency psychological consultant Jerry

5    Gardner, Ph.D., reviewed records and noted that Plaintiff was not in active
     treatment, had normal mental status examinations, and managed his

6    anxiety well apart from conflicts about his Social Security application (AR
     135). Dr. Gardner concluded that Plaintiff did not have a severe mental

7    impairment (AR 135). In December 2018, State agency psychologist
     Phaedra Caruso-Radin, Psy.D., agreed that Plaintiff did not have a

8    severe mental impairment, noting his activities including leading a
     motorcycle club (AR 151). In January 2019, State agency medical

9    consultant J. Allen, M.D., reviewed the records, and noted that Plaintiff
     had very poor vision in his right eye, but his other conditions were

10   controlled; examinations were unremarkable; and he was able to ride a
     motorcycle, do household chores, walk three miles per day, take care of

11   family members, and lead his local motorcycle club (AR 150). Dr. Allen
     found that Plaintiff could perform a range of medium work with additional

12   postural, environmental, and visual limitations (AR 153-655).
             At the July 2020 hearing, Board-certified ophthalmologist Willie

13   Benton Boone, M.D., testified that he had reviewed the records from B1F
     through B16F (AR 16-17; *see* AR 656-1241 (Exhibits B1F-B16F). Dr.

14   Boone testified that Plaintiff had various diagnoses including corneal
     ectasia, keratoconus in the right eye worse than the left, allergic

15   conjunctivitis and corneal planus with corneal graft failure, giant papillitis
     of the right eye, floppy eyelid syndrome, status post retinopathy,

16   pseudophakia or intraocular lens implantation of the right eye, status post
     YAG laser treatments with history of photophobia treated with artificial

17   tears, Pataday medicines, and transition lenses, and diabetes with no
     retinopathy (AR 17-18). He stated that Plaintiff's impairments did not

18   meet or equal any of the per se disabling listed impairments from the
     Commissioner's regulations (AR 18). He explained that Plaintiff alleged

19   environmental sensitivities, but that he was able to ride his motorcycle,
     hike, and camp without being bothered by allergens and dust (AR 19). Dr.

20   Boone testified that the record showed that Plaintiff's symptoms were
     much better when he was inside, and that cleaning chemicals should not

21   affect his eyes (AR 20). He noted Dr. Pena's recent letter about concerns
     with exposure to light but disagreed with it because Plaintiff's treating

22   sources treated his photophobia with artificial tears, Pataday medicine, and
     transition lenses, which would protect against light (AR 21-22). He

23   explained that the medications also helped with light tolerance (AR 22-
     23).

24
     ECF No. 21, pgs. 2-4.
25

26           Plaintiff concedes that the ALJ's analysis was correct at Step 1.  See ECF No. 178,

27   pg. 13.  The Court turns to Plaintiff's contentions throughout the remainder of the five-step

28   sequential evaluation process.

1

### A.      Severity Determination at Step 2

2          To qualify for benefits, the plaintiff must have an impairment severe enough to

3 significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§

4 404.1520(c), 416.920(c).  In determining whether a claimant's alleged impairment is sufficiently

5 severe to limit the ability to work, the Commissioner must consider the combined effect of all

6 impairments on the ability to function, without regard to whether each impairment alone would be

7 sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42

8 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of

9 impairments, can only be found to be non-severe if the evidence establishes a slight abnormality

10 that has no more than a minimal effect on an individual's ability to work.  See Social Security

11 Ruling (SSR) 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting

12 SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by

13 providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20

14 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.

15 See id.

16          At Step 2, the ALJ concluded that Plaintiff's right shoulder impairment was non-

17 severe because it did not persist for a 12-month continuous period.  See CAR 167.  The ALJ

18 stated:

19
> The claimant had right shoulder pain after being in a motorcycle accident
20 > in May 2019 (Exhibit B7F/58). He had impingement syndrome of the right
> shoulder and superior glenoid labrum lesion of the right shoulder. He had
> a complete rotator cuff tear or rupture of the right shoulder (Exhibit
21 > B10F/8, 10-11). A MRI showed a rotator cuff tear with a presumed ill-
> defined full-thickness component in the critical zone with some retraction
22 > but no definite atrophy of the musculotendinous remnant (Exhibit
> B10F/10). On examination, he had 5/5 strength in the bilateral upper
23 > extremities except for 4/5 (due to pain) in the right shoulder
> abduction/flexion, bicep flexion, and tricep extension (Exhibit 10F/9). He
24 > had an injection in the right shoulder in September 2019 (Exhibit
> B11F/21). He did physical therapy for his right shoulder from October
25 > to December 2019. When he was discharged from physical therapy notes
> stated he was able to reach overhead and he could do about 20 pound
26 > weights (Exhibit B12F/5). Overall, the claimant did not experience right
> shoulder symptoms for a continuous 12-month period, therefore it is
27 > nonsevere.

28 CAR 167.

1      The ALJ also addressed Plaintiff's complaint of right lower extremity issues,

2   concluding they are also not severe impairments because they did not persist for a 12-month

3   continuous period.  See CAR 167.  The ALJ stated:

4
        He also had right lower extremity issues. He reported a history of right
5       foot pain related to a May 2019 accident (Exhibits B7F/58; B10F/8). July
        2019 notes stated that his leg injury was doing better. He was walking
6       daily did also report pain (Exhibit B7F/50). In August 2019, he reported
        his right foot pain was improved (Exhibit B10F/8, 10-11). A July 2019
7       MRI of the right foot showed soft tissue swelling adjacent to the first and
        second digits ventral aspect represented by subcutaneous increased T2
8       signal. (Exhibit B10F). Even if there is a right foot medically determinable
        impairment, the claimant did not experience right foot symptoms for a
9       continuous 12-month period, therefore it is non-severe.

10      CAR 167.

11      Finally, the ALJ concluded that Plaintiff's mental impairment, while medically

12  determinable, was non-severe:

13
        The claimant's medically determinable mental impairment of anxiety did
14      not cause more than minimal limitation in the claimant's ability to perform
        basic mental work activities and was therefore non-severe.

15
        In making this finding, the undersigned has considered the broad
16      functional areas of mental functioning set out in the disability regulations
        for evaluating mental disorders and in the Listing of Impairments (20
17      CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas
        are known as the "paragraph B" criteria.

18
        The first functional area is understanding, remembering or applying
19      information. In this area, the claimant had no limitation. He was able to
        process things accurately (Exhibit B7F/62). He was a good historian
20      (Exhibit B8F/35).

21      The next functional area is interacting with others. In this area, the
        claimant had mild limitation. In a visit where he expressed stress over his
22      social security denial, he reported that his mood was irritable and affect
        was angry (Exhibit B4F/9-10). However, he was polite in examinations
23      (Exhibit B7F/62). He reported that his anxiety had eased. He was dating
        and was actively involved in community events and activism. Notes stated
24      he seemed active and upbeat (Exhibit B8F/14).

25      The third functional area is concentrating, persisting or maintaining pace.
        In this area, the claimant had no limitation. The medical evidence of
26      record shows the claimant generally did not complain to treating
        practitioners of serious difficulty maintaining concentration, persistence,
27      and pace, nor did practitioners appear to observe these limitations.

28  / / /

9

1

2

The fourth functional area is adapting or managing oneself. In this area, the claimant had no limitation. The medical evidence of record shows the claimant did not usually complain about serious problems with adaptation and managing himself. Observations of treating practitioners generally show the claimant had no deficiencies in hygiene and wore appropriate attire (Exhibit B8F/62).

3

4

Because the claimant's medically determinable mental impairment caused no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it was non-severe (20 CFR 404.1520a(d)(1)).

5

6

7

CAR 167-68.

8

9      Plaintiff argues that the ALJ "gave no specific, legitimate reason for disregarding

10   the opinion of Plaintiff's treating physicians." ECF No. 18, pg. 14. Plaintiff also contends the

11   ALJ erred by failing to consider the combined effect of Plaintiff's impairments. See id. at 15.

12   Finally, Plaintiff asserts that the ALJ erred with respect to evaluation of mental impairments. See

13   id. at 16.

14      The Court agrees with Defendant that Plaintiff has not provided any meaningful

15   arguments related to Step 2. Generally, Plaintiff does not state which impairments he believes the

16   ALJ improperly found to be non-severe. Specifically, while Plaintiff contends the ALJ failed to

17   consider treating physician opinions, Plaintiff does not identify any such opinions, nor can the

18   Court upon a thorough review of the entire certified administrative record. To the extent Plaintiff

19   relies on Dr. Pena's June 2020 statement concerning limitations associated with Plaintiff's eye

20   impairment, the ALJ found such impairment to be severe. Plaintiff makes no mention of the

21   other doctors who rendered opinions (Drs. Post, Gardner, Caruso-Radin, Allen, and Boone).

22      The Court finds that Plaintiff has not met his burden of identifying any legal error

23   at Step 2 or pointing to any evidence supporting a conclusion different than that reached by the

24   ALJ. Upon a review of the record and the ALJ's entire decision, the Court further finds that the

25   analysis at Step 2 is supported by proper legal analysis and substantial evidence.

26   / / /

27   / / /

28   / / /

10

1

**B.      Listings Analysis at Step 3**

2

        The Social Security Regulations "Listing of Impairments" (Listings) is

3

comprised of impairments to fifteen categories of body systems that are severe enough to

4

preclude a person from performing gainful activity.  Young v. Sullivan, 911 F.2d 180, 183-84

5

(9th Cir. 1990); 20 C.F.R. § 404.1520(d).  Conditions described in the listings are considered so

6

severe that they are irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or

7

equaling a listing, all the requirements of that listing must be met.  Key v. Heckler, 754 F.2d

8

1545, 1550 (9th Cir. 1985).

9

        At Step 3, the ALJ considered application of Listings 1.02, 2.02, 2.03, and 2.04,

10

and concluded that Plaintiff's impairments did not meet or medically equal any of these Listings.

11

See CAR 168-69.  The ALJ stated:

12

        The undersigned considered listings 1.02, 2.02, 2.03, 2.04. The record
does not establish the medical signs, symptoms, laboratory findings or

13

degree of functional limitation required to meet or equal the criteria of any
listed impairment and no acceptable medical source designated to make

14

equivalency findings has concluded that the claimant's impairment(s)
medically equal a listed impairment.

15

16

        CAR 169.

17

        Plaintiff argues the ALJ erred by not finding that Plaintiff's impairments satisfy

18

any of the Listings.  See ECF No. 18, pgs. 17-20.  According to Plaintiff:

19

        In the present matter, the ALJ did not consider Plaintiff's
collective symptoms, signs, and laboratory findings.  It is undisputed and

20

the medical record states that Plaintiff has been diagnosed with allergic
conjunctivitis, asthma, carpal tunnel syndrome, cataract, corneal ectasia,

21

dermatitis, seborrheic, diabetes mellitus without mention of complication,
type II or unspecified type, erectile dysfunction, GERD, hyper-

22

triglyceridemia, impaired fasting glucose, keratoconjunctivitis, NEC, NOS
gastroduo w/o hemo, obesity, other chronic allergic conjunctivitis, panic

23

disorder, post traumatic stress disorder, skin tab, type 2 diabetes mellitus,
and ulnar neuropathy.

24

        Id. at 17.

25

26

/ / /

27

/ / /

28

/ / /

11

1                      With one exception discussed below related to Plaintiff's eye impairment, which

was found to be severe, Plaintiff does not argue which of these various other impairments found

to be severe at Step 2 should have been found to meet a Listing at Step 3, or why.  Therefore, the

Court addresses only Plaintiff's argument related to his eye impairment.

As to his eye impairment, Plaintiff argues:

> Plaintiff's right eye vision was 20/400, and his left eye was 20/30. He was found to have corneal ectasia, right much greater than left, most likely pellucid marginal degeneration, not keratoconus, severe allergic conjunctivitis with superior corneal pannus and giant papillae, right, floppy eyelid syndrome, both eyes, pseudophakia, and right, photophobia. See Exhibit "**B2F, pdf pgs. 12-15**".
>
> Dr. Lien saw Plaintiff for corneal crosslinking. His assessment showed corneal ectasia right more than left, history of severe allergic conjunctivitis, giant papillary conjunctivitis (GPC) right more than left, history of right ocular hypertension, pseudophakia, right, and floppy eyelid syndrome status post BUL surgery. See Exhibits "**B1F pdf pgs. 36-40**" and "**B8F pdf pgs. 41-46**".
>
> Plaintiff had a history of progressively worsening. . . eye allergies since his military duty in 1992. See Exhibits "**B3F pdf pgs. 53-56**" and "**B7F pdf pgs. 57-60**".
>
> * * *
>
> Plaintiff had extreme photophobia, which was visually debilitating for him to function even in normal lighting conditions. Ophthalmologists believe that exposing him to bright lights and toxic chemicals was not in his best interest. Plaintiff was advised by treating physicians to have all curtains and blinds closed in his home. Also, in addition to his extreme photophobia, he had much poorer vision in his right eye. The significant difference between his two eyes has caused his depth perception or binocular vision to be decreased. See Exhibit "**B14F pdf. 110**".

ECF No. 18, pgs. 17-18.

At issue relating to visual acuity are Listings 2.02, 2.03, and 2.04.  Listing 2.02 describes loss of central visual acuity, defined by evidence of remaining vision in the better eye after best correction of 20/200 or less.  Listing 2.03 describes contraction of visual field in the better eye.  To meet or equal this listing, the evidence must show any one of the following objective findings: (A) The widest diameter subtending an angle around the point of fixation no greater than 20 degrees; or (B) An MD of 22 decibels or greater, determined by automated static threshold perimetry that measures the central 30 degrees of the visual field; or (C) A visual field efficiency of 20 percent or less, determined by kinetic perimetry.  Listing 2.04 is

1    satisfied by evidence indicating a loss of visual efficiency percentage in the better eye of 20 or

2    less after best correction or a visual impairment value of 1.00 or greater in the better eye after

3    best correction.

4              Notably absent in this case is evidence establishing any of the requirements of

5    Listings 2.02, 2.03, or 2.04.  Plaintiff acknowledges that the vision in his best eye is measured at

6    20/30.  Thus, Listing 2.02 cannot be met.  Plaintiff has cited to no evidence establishing the A, B,

7    or C criteria of Listing 2.03.  Nor has Plaintiff pointed to evidence establishing relating to loss of

8    visual efficiency or a visual impairment of his best eye as required under Listing 2.04.  The issues

9    Plaintiff mentions – allergic conjunctivitis, loss of depth perception and binocular vision,

10   photosensitivity – are not elements of Listings 2.02, 2.03, or 2.04.

11             The Court finds no merit in Plaintiff's arguments and further finds no error with

12   the ALJ's analysis at Step 3.

13       **C.    Residual Functional Capacity Finding at Step 4**

14             Residual functional capacity is what a person "can still do despite [the

15   individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

16   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

17   "physical and mental capabilities").  Thus, residual functional capacity describes a person's

18   exertional capabilities in light of his or her limitations.[3]  An ALJ's RFC finding must include all

19   of the limitations the ALJ has found to be supported by the evidence of record. See SSR 85-15.

20   / / /

21   ─────────────────

22   [3]    Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart

23   P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20

24   C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§

25   404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§

26   404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§

27   404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  See 20

28   C.F.R. §§ 404.1567(e) and 416.967(e).

1    In determining residual functional capacity, the ALJ must assess what the plaintiff

2    can still do in light of both physical and mental limitations.  See 20 C.F.R. §§ 404.1545(a),

3    416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual

4    functional capacity reflects current "physical and mental capabilities").  Where there is a

5    colorable claim of mental impairment, the regulations require the ALJ to follow a special

6    procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record pertinent

7    findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

8    At Step 4, the ALJ concluded Plaintiff has the physical residual functional capacity

9    to perform medium work with certain limitations.  See CAR 169-71.  The ALJ did not find any

10    limitations to Plaintiff's mental residual functional capacity.  See id.  Regarding Plaintiff's

11    physical residual functional capacity, the ALJ stated:

12    
13    
14    
15    
16    
17    
> The claimant had a history of eye issues (Exhibit B2F/59; B8F/20). There
> has been ongoing monitoring of the corneal ectasia (Exhibit B8F/3). He
> had a significant visual acuity deficit on the right, which resulted in a loss
> of depth perception that requires a safety precaution for hazards of work at
> heights or around moving machinery (Exhibit B8F/3-7). The claimant is
> further precluded from working with small objects or jobs requiring
> reading of small print. In August 2018, he reported that his eyes felt much
> better now that he was not working around as much dirt and allergens
> (Exhibit B3F/8). As a result, he is precluded from concentrated exposure
> to environmental irritants, such as dust, gases, fumes, and chemicals.
> Notes stated he also needed new glasses (Exhibit B3F/8).

18    
19    
20    
21    
> A June 2020 letter from an optometrist noted that he had extreme
> photophobia that made it debilitating to him to function even in normal
> lighting conditions. The letter noted that exposing him to bright lights and
> toxic chemicals was not in his best interest. She noted he needed to have
> his curtains and blinds closed at home (Exhibit B14F). However, other
> notes indicated that photophobia was treated with transitional lenses,
> Pataday drops, and artificial tears (Exhibit B8F/5, 20, 40).

22    
23    
24    
25    
26    
27    
28    
> The medical expert testified that the claimant had medically determinable
> impairments including cornea ectasia; keratoconus; allergic conjunctivitis
> and corneal pannus; giant papillitis of the right eye; floppy eyelid
> syndrome; status post blepharoplasty; pseudophakia of the right eye;
> status post YAG laser surgery. He testified the claimant had a history of
> photophobia and it was treated with transitional lenses, Pataday drops, and
> artificial tears (Exhibit B8F/5, 20, 40). The medical expert testified that
> the claimant did not meet or equal a listing. He said he did not see
> anything in the record to suggest that the claimant's vision would be
> affected from standard cleaning chemicals. He also submitted a response
> to a medical interrogatory even though the undersigned did not send out an
> interrogatory. His responses in the document are similar to his testimony
> (Exhibit B16F).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Something the medical expert went back to several times with both the arguments, i.e., environmental irritants, and bright lights is that the claimant is able to ride his motorcycle, which requires he be able to function near environmental irritants such as dust, and also visually manage light, and chiaroscuro. The claimant testified that he needed very dark sunglasses and a helmet to do so. This is consistent with the medical expert's assessment that with his prescribed eyewear, he is able to manage these factors.

He also had diabetes mellitus. In February 2018, notes stated that he lost 15 pounds over the last few months and his A1C was 6.3 on Metformin. The plan was to continue medication, diet and exercise (Exhibit 1F/11). June 2018 notes stated that last year, his HbA1c was very high and he did a major diet change and was on the max dose of metformin. His blood sugar improved and his metformin dose was reduced to 500mg daily to prevent hypoglycemia. His most recent HbA1c trended up (Exhibit B2F/87).

The claimant was also obese with a BMI of 36.1 in 2019 (Exhibit B7F/67). SSR 19-2p provides that obesity can cause limitations in function; including limitations in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balance, stooping, and crouching. This Ruling also states that obesity can cause limitations in the ability to manipulate with hands or fingers, limitations in toleration of environmental factors such as heat, humidity, or hazards; and social limitations. Although there is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment nor do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes, an individualized assessment of the impact of obesity on an individual's functioning is done to determine whether the impairment is severe. Accordingly, the undersigned finds that the obesity alone causes a limitation in his ability to perform basic work activities, and the residual functional capacity above more than adequately accounts for this impairment.

* * *

As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because he had been walking for diabetes management and he reported that he could walk for 3 miles before needing to rest (Exhibits B3E; B7F/62). He reported doing better, walking three times a day, he was highly engaged in his work as a bikers' rights advocate, and he was involved in community events (Exhibit B8F/14). The claimant cancelled or failed to show up for doctor appointments on a number of occasions. The claimant was a no show for various physical therapy appointments (Exhibit B12F/8-9, 13-14, 24).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

15

The medical expert opinion is persuasive and consistent with the record as a whole. He is a specialist in ophthalmology and he has an awareness of all the evidence in the record, and he has an understanding of social security disability programs and evidentiary requirements. Most importantly, his opinion regarding the claimant's limitations is well-supported by the objective medical evidence.

In July 2018, a state agency consultant at the initial level, Yvonne Post, D.O. opined the claimant could do medium work and was limited with right eye vision in the following areas: near acuity, far acuity, depth perception, accommodation, color vision, and field of vision (Exhibit B3A). In January 2019, a state agency consultant at the reconsideration level, J. Allen, M.D. affirmed the initial level opinion but added that the claimant could occasionally climb ramps and stairs, kneel crouch and crawl and never climb ladders, ropes or scaffolds. He could frequently balance and stoop. Dr. Allen also found the claimant should avoid even concentrated exposure to hazards (Exhibit B5A). These opinions are partially persuasive. Dr. Post's opinion is consistent with the record that he would have these limitations but he is further limited. Dr. Allen was able to review records that are more current and the opinion is more persuasive with the records as a whole that his diabetes, obesity, and vision impairments limit him to environmental irritants.

CAR 169-71.

Plaintiff argues generally that the ALJ's determination at Step 4 is not supported by substantial evidence and that he does not have the capacity to perform medium work with limitations. See ECF No. 18, pg. 20. More specifically, Plaintiff contends that the ALJ failed to adequately consider his eye impairment. See id. at 21-23. As discussed above, the Court finds no error with respect to Plaintiff's eye impairment or any other impairment. Plaintiff has presented the Court with no specific arguments related to the ALJ's analysis at Step 4, such as evaluation of the medical opinions or Plaintiff's subjective statements and testimony.

The Court finds no error in the ALJ's evaluation of Plaintiff's residual functional capacity at Step 4.

### D.    Vocational Findings at Step 5

At Step 5, the Medical-Vocational Guidelines (Grids) provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity. The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity. See

16

1   Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the

2   Grids).

3          The Commissioner may apply the Grids in lieu of taking the testimony of a

4   vocational expert only when the Grids accurately and completely describe the claimant's abilities

5   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

6   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

7   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

8   exertional strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If

9   a claimant has an impairment that limits his or her ability to work without directly affecting his

10  or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

11  the Grids." Penny v. Sulliacvan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

12  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

13  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

14  limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

15  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

16         In cases where the Grids are not fully applicable, the ALJ may meet his burden

17  under step five of the sequential analysis by propounding to a vocational expert hypothetical

18  questions based on medical assumptions, supported by substantial evidence, that reflect all the

19  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

20  where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient

21  non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See

22  Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

23         Hypothetical questions posed to a vocational expert must set out all the substantial,

24  supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881

25  F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the

26  expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary

27  value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to

28  the expert a range of hypothetical questions based on alternate interpretations of the evidence, the

17

hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

The ALJ concluded at Step 5 that Plaintiff can perform other work that exists in the national economy.  See CAR 172-73.  The ALJ stated:

> Through the date last insured, if the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.22. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations.
>
> To determine the extent to which these limitations erode the unskilled medium occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and the judge proffered a more restrictive residual functional capacity to the vocational expert. As the residual function capacity determined in this decision is actually less restrictive than the hypothetical proffered to the vocational expert since it consisted of never climbing ladders, ropes or scaffolds, occasional crouching, and frequently using the right lower extremity for pushing, pulling or foot controls, the claimant can perform the below jobs. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as a dishwasher, DOT 318.687-010, medium and SVP 2, with 145,000 jobs in the national economy; a hospital housekeeper, DOT 323.687-010, medium and SVP 2, with 80,000 jobs in the national economy; and a laundry worker, DOT 361.684-014, medium and SVP 2, with 75,000 jobs in the national economy.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.
>
> CAR 172-73.

/ / /

/ / /

/ / /

Plaintiff argues the ALJ's vocational findings and Step 5 are flawed because the ALJ failed to properly evaluate the medical opinions at Step 4 and, therefore, relied on the vocational expert's answers in response to hypothetical questions which did not accurately reflect Plaintiff's residual functional capacity.  See ECF No. 18, pgs. 23-26.  Specifically, Plaintiff faults the ALJ's evaluation of opinions from Plaintiff's treating physicians.  See id. at 23, 25.  According to Plaintiff:

> It is difficult to determine the basis of the ALJ's determination that Plaintiff retained the ability to perform the sedentary, light, and medium work.  The ALJ did not state in her Decision that she was rejecting the opinions of the treating physicians.  Indeed, the ALJ did not refer to the notes, reports, and letters in the record written by Plaintiff's treating and examining physicians.

> Id. at 25.

Plaintiff's brief regarding the ALJ's analysis at Step 5 spans four pages.  Other than the quoted paragraph above, Plaintiff's argument consists entirely of quoted material from other cases, including references to doctors and evidence in those other cases.  Plaintiff does not in these four pages of discussion include any reference to the evidence relevant to the instant case.

Just as Plaintiff finds it difficult to determine the basis of the ALJ's determination, the Court finds it difficult to find any good faith basis for Plaintiff's assignment of error at Step 5.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## IV.  CONCLUSION

2          Based on the foregoing, the Court concludes that the Commissioner's final

3   decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

4   ORDERED that:

5                 1.      Plaintiff's motion for summary judgment, ECF No. 18, is denied;

6                 2.      Defendant's motion for summary judgment, ECF No. 21, is granted;

7                 3.      The Commissioner's final decision is affirmed; and

8                 4.      The Clerk of the Court is directed to enter judgment and close this file.

9

10   Dated:  May 4, 2023

11
                                          _____
12                                         DENNIS M. COTA
                                          UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28